## AFFIDAVIT

I, Amy L. Howard, Special Agent with the Federal Bureau of Investigation (FBI) being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## INTRODUCTION AND AGENT BACKROUND

1.  I am a Special Agent with the FBI, and have been since 2015.  I am currently assigned to the Denver Division – Fort Collins Resident Agency of the FBI.  I investigate individuals who have participated in narcotics distribution networks in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C) and I am fully familiar with the facts of the case.  During the course of my career, I have been involved in investigations involving the internet, cellular telephones, and email, and I am familiar with social media networks.  Many of my cases have involved the seizure and subsequent analysis of digital devices, including cell phones and SIM cards.  As discussed in more detail below, I have become familiar, through training and experience, with the type of evidence which may be found on digital devices and how digital devices operate and must be examined.

2.  This affidavit is submitted in support of an application related to the search of ten cellular phones, one tablet and two laptop computers (also referred to as electronic devices) in the custody of the Federal Bureau of Investigation (FBI) Denver Division. These electronic devices were found on January 31, 2019, during the execution of a lawfully obtained search warrant issued by this court.

3.  The facts in this affidavit come from my personal observations, my training and experience, and information relayed to me by other agents and witnesses. This affidavit is intended to set forth probable cause in support of the limited purpose of securing the requested search warrant, and does not purport to set forth all of my knowledge regarding this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C) are present within the electronic devices described.

*Identification of the Devices to Be Examined*

4.  Several items are held in evidence at the FBI Denver Field Office, which were seized during the execution of a search warrant on 1536 Peterson Street, Fort Collins, Colorado, on January 31, 2019. The items include:

    A.  One Android cellphone in a brown/black case, found in the glove box of Ernesto Ibarra's vehicle, a GMC Jimmy SUV, which was parked in the driveway of the residence.

    B.  One LG cellphone (no case), found in the glove box of Ernesto Ibarra's vehicle, a GMC Jimmy SUV, which was parked in the driveway of the residence.

    C.  One LG cellphone in a purple case, found in the backseat of Ernesto Ibarra's vehicle, a GMC Jimmy SUV, which was parked in the driveway of the residence.

    D.  One HTC cellphone in a pink case, found in a bag in the closet in the basement, where Ernesto Ibarra's family resided.

    E.  One Samsung cellphone, found in a drawer next to the bed in the basement's main living area where Ernesto Ibarra and his wife resided.

    F.  One LG cellphone (no other descriptors), found on the bed in the basement's main living area where Ernesto Ibarra and his wife resided.

G. One Droid cellphone, found on the floor next to the bed in the basement's main living area where Ernesto Ibarra and his wife resided.

H. One Samsung cellphone (SM-J727P) found on a box next to the bed in the basement's main living area where Ernesto Ibarra and his wife resided.

I. One Verizon Ellipsis tablet, found in a bag on the floor in the basement's main living area where Ernesto Ibarra and his wife resided.

J. One HP Laptop Model TPN-I108; Serial #5CG34931BM, found in a bag on the floor in the basement's main living area where Ernesto Ibarra and his wife resided.

K. One Toshiba Laptop; Serial #4A026802Q, found on the top shelf of the closet in the basement, where Ernesto Ibarra's family resided.

5. I believe there is probable cause to believe that the devices are or contain evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) and (b)(1)(C). The applied-for warrant would authorize the forensic examination of the devices for the purpose of identifying electronically stored data particularly described in Attachment B.

6. The devices are currently in the lawful possession of the FBI. They came into the FBI's possession through the execution of a federal search warrant on January 31, 2019.

7. The devices are currently in storage at the FBI Denver Field Division. In my training and experience, I know that the devices all have been stored in a manner in which the contents are, to the extent material to this investigation, in substantially the same state as they were when the devices first came into the possession of the FBI.

## **PROBABLE CAUSE**

### *Background on Ernesto Ibarra Jr.*

8. Ernesto Ibarra, Jr. (YOB 1976) is a permanent resident of the United States. NCIC checks into his criminal history show that he had multiple arrests on his record including: 1996, Hit and Run (California); 1998, Burglary, Theft, Damage of Property and Harassment (Colorado), sentenced to two years' probation; 2002, Contempt – Disobey Court Order (California); 2003, Contempt of Court – Failure to Comply (Colorado); 2003, Driving Related Offenses (Texas); 2004, Driving Related Offenses (Colorado); 2011, Failure to Appear (Colorado); 2017, Driving Related Offense (Colorado), sentenced to twenty days in jail.

### *Ibarra's Use of Electronic Devices in Furtherance of Drug Trafficking*

9. Upon the initiation of an investigation into the fentanyl overdose death of Ivan Warren (YOB 1990) on 09/26/17, investigators from the Fort Collins Police Department obtained a Colorado State search warrant, signed on 10/16/17, for the forensic analysis of Warren's phone. On this device, investigators observed a message thread between Warren and an account in the name of "Ernesto Ibarra" with the Facebook user ID 100001553350879. The username listed for this Facebook account was "Ernesto Ibarra (Ese Boxer)." In this thread, the two made references to "perks," "10mg," "20mg," "pinks," "blues," "rps," and "a333," among other terms. According to agents assigned to the Northern Colorado Drug Task Force (NCDTF), "perks" is a common slang for Percocet pills, which is an opioid. Similarly, the other listed terms are common slang references to pills' strength, color, and imprint, respectively. Within the conversations,

Ibarra also made explicit reference to a "pill," and to owing "3 pills" to a third party.  From the context of these conversations, it appears that Warren and Ibarra were discussing Warren's procurement of various pills from Ibarra.  Investigators observed multiple text and Facebook messenger exchanges between Ibarra and Warren regarding drug transactions in September of 2017.

10.  In the days leading up to Warren's death, Warren completed multiple purchases of prescription opioids. To arrange those transactions, Warren exchanged both Facebook messages as well as text messages with 970-799-9214, which was listed in Warren's phone as "Mex 4." Based on the review of the text messages exchanged, investigators identified the user of that phone number was as Ernesto Ibarra, Jr.

11.  Among the reasons the user of that phone was identified as Ibarra were the syntax and punctuation of the text messages sent by 970-799-9214. Those messages were very similar to those used by Ibarra in his previously described Facebook messages, including Ibarra's unusual habit of putting a period after every few words. Additionally, some of the conversation between Ibarra's Facebook accounts and that phone number appeared to be discussing the same drug transaction, and from the context it appeared Ibarra was the user of the phone. Finally, in the first message received on Warren's phone from 970-799-9214 on 08/14/17, the user of the phone said "My new number.  This is boxer." Previously, Warren had exchanged text messages extensively with 970-689-1788, a number in Warren's phone as "3 Mex." In the first message received on Warren's phone on 05/21/17, the user of that phone said "Hey this. Ernesto aka boxer. Got a new number.  Save it."

12.  Your Affiant is aware that distributors of controlled substances will often change phone numbers frequently in order to thwart law enforcement. From Warren's phone records, it appeared Warren was updating Ibarra's number sequentially in his phone ("3 Mex," then "Mex 4") as Ibarra changed phone numbers. From the context of the conversation, the matching syntax and punctuation, as well Ibarra self-identifying using his known moniker of Boxer and his first name, your Affiant identified the user of 970-799-9214 in late September of 2017 as Ernesto Ibarra.

13.  Upon the initiation of an investigation into the fentanyl overdose death of Ryan McMurray (YOB 1981) on 12/12/18, NCDTF interviewed McMurray's widow, Krystal McMurray (YOB 1988).  Krystal explained that, on 12/10/18, McMurray had crushed up and snorted two 30mg oxycodone pills and ingested a third orally.  During questioning from Krystal, McMurray admitted he had used opioids that evening and that he obtained them from someone named "Boxer" at the convenience store.  While being treated in the emergency room after taking the pills, McMurray requested his cellphone.  Krystal took the phone and checked the messages.  Krystal saw a message thread with recent activity on McMurray's phone, which appeared to reference at least one drug transaction. Krystal took a picture of the screen with her phone, then deleted the message string so that Ryan would no longer have the number.  In the message string, it appeared McMurray was conversing with an individual using the number 970-832-2469. Krystal later sent the picture to NCDTF investigators.  In the text, which was only partially visible in the picture, the other individual said ". . . manufacture I saw the script bottle we all good."  McMurray replied that they were good, and the two discussed getting more in the morning.  After McMurray's death on 12/12/18, investigators noted the last three searches in the Facebook application appeared to be for the first name "Ernesto" and three different Hispanic last names.

14.  The number McMurray was communicating with, 970-832-2469, was later identified as belonging to Ibarra. Specifically, investigators obtained a search warrant which permitted them to track the location of the device assigned call number 970-832-2469. The location data obtained as a result of that search warrant let investigators to conclusively determine Ibarra was the user of that phone number.

*Federal Search Warrant Execution on January 31, 2019*

15. On January 31, 2019, the FBI, along with assistance from Fort Collins Police Services, executed a search warrant, issued in the U.S. District Court for the District of Colorado (19-sw-5082-NRN), at 1536 Peterson Street, Fort Collins, Colorado—the known residence of Ernesto Ibarra, Jr.

16. Investigators were conducting surveillance of 1536 Peterson Street prior to the execution of the search warrant.  At the time of the search warrant execution, investigators made lawful announcements to alert the occupants 1536 Peterson Street to the presence of law enforcement, and that a search warrant had been obtained for the property.  All occupants were given instructions to exit the residence.  Ultimately, investigators discovered two adults inside the residence—Ibarra and his wife, Angela Cruz (YOB 1981).

17. Investigators searched the residence and, in summary, found multiple electronic devices, including cell phones, laptops, and a tablet.  In addition to the devices this warrant seeks permission to search, investigators also found one LG cellphone with "Sabrina" on the back which was found in a bag in the basement back-bedroom where Ibarra's minor children resided and one Apple iPhoneS, found on a shelf in the basement back-bedroom where Ibarra's minor children resided.  This warrant does not seek permission to search those two devices because it seems reasonable to assume those devices were primarily associated with Ibarra's minor children and were probably not used for drug trafficking activity.  Also found at the residence were $637.00 in U.S. currency, a purchase agreement for an engagement ring, and indicia of occupancy.  Investigators did not recover any evidence of drugs or drug paraphernalia, but in a later interview, Ibarra stated he typically did not have pills on-hand.  If he received pills from a source, he would usually keep a few for him and his wife to take and then sell the rest.  Ibarra did this because he needed a quick source of income, since he had been unemployed for some time.

18. Ibarra was renting the basement of 1536 Peterson Street at the time of the search.  His wife and two minor children also occupied the basement.  Ibarra was renting from Elizabeth Amanda Rodriguez-Hopkins (YOB 1989) and her boyfriend, who occupied the main floor of the one-story house.  Ibarra stated he had been homeless for years and jumped around to motels in Fort Collins, CO.  Prior to residing at 1536 Peterson Street, he and his family had been living in a Motel Six.  In September of 2017, Ibarra and his family were living at America's Best Inn on North College Avenue in Fort Collins.  Ibarra stated that all of the profits from his drug sales went to rent.

19. While the search was executed, Ibarra spoke with Special Agent Amy L. Howard and NCDTF Officer, Christopher "CJ" O'Loughlin in O'Loughlin's vehicle.  When Ibarra's cell phone, a black LG model, was located, Ibarra gave investigators verbal and written consent to search the phone.  During a brief review of the messages, investigators noted approximately five text messages related to drug transactions.  Ibarra also signed consent for investigators to search his GMC Jimmy, which was parked in the drive way at the residence.

*Interview of Ernesto Ibarra Jr. on January 31, 2019*

20. On January 31, 2019, Ibarra read, acknowledged that he understood, and signed an Advice of Rights form prior to speaking with investigators.

21. Ibarra said that he primarily sold "oxys" and "perks," which your Affiant knows to be Oxycodone and Percocet.  Ibarra said the going rate for "oxy" was $1/mg, but he paid half that.  He would typically get 20 mg for $10 and then sell them for $20 a pill. He had approximately ten to fifteen customers.  Ibarra said he

had approximately fifteen to twenty suppliers.  Ibarra said that he did not deal fake pills, but acknowledged that he received twenty to thirty "blues" from a source named Ace.  Ibarra gave the pills back to Ace and asked for his money back, once he discovered they were fake.  This took place two months prior.  Ibarra said that he always asks for a picture of the prescription bottle as proof that the pills are a real prescription. Ibarra acknowledged giving three blue pills to Ivan Warren the night before his death.  He initially denied selling Ryan McMurray "blues" the prior to his death, but he did say that he gave McMurray 10mg "pinks" and 20mg "grays."  When shown a text message between McMurray and Ibarra, contained on Ibarra's cell phone, regarding a drug transaction, Ibarra denied that was a text he would send.  Ibarra stated he doesn't even know how to spell the word "manufacture," contained in the text, and that he didn't believe it was his phone number (970-832-2469).  After the investigator showed Ibarra on his cell phone that 970-832-2469 was in fact his telephone number, he acknowledged that it was his.

22. Ibarra said he usually called or texted customers and suppliers.  He stated that his current phone was the fifth new number he's had and that he changed his phone out frequently.  He said that he does not usually use Facebook to communicate and he typically deletes his texts and Facebook messages.

23. A review of Ibarra's imaged cell phone, after the interview with Ibarra, showed multiple saved photos of blue, white, and yellow pills.  Your Affiant also observed photos of piles of cash.  A screenshot of a text message between Ibarra and an individual named Ace, saved on 12/01/18, documented a conversation regarding Ibarra returning fake pills to Ace.  A screenshot of a text message between Ibarra and an individual named Elayna, saved on 12/04/18, documented a conversation regarding friend of Elayna's that had overdosed.  Ibarra questioned whether it was from "blues."  Your Affiant also observed a screenshot of a Google search, saved on 01/19/19, regarding the price of Oxycodone.

24. On January 31, 2019, Ibarra was charged by criminal complaint with one count of distributing a controlled substance which resulted in death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

*Interview of Ernesto Ibarra Jr. on February 1, 2019*

25. While transporting Ibarra to the custody of the U.S. Marshals on February 1, 2019, investigators once again asked Ibarra if he would agree to answer questions. Ibarra read, acknowledged that he understood, and signed an Advice of Rights form prior to answer the investigators' questions.

26. When speaking about Ryan McMurray's death, Ibarra stated that it could have been him that gave McMurray the pill that killed him, but he didn't realize it was fake or that it was fentanyl.  Ibarra said that he sold McMurray "pinks" and "blues," but he does not remember what day.  He also stated that he gave him 15mg "greens."  Ibarra advised that he didn't necessarily know the pills he distributed contained fentanyl. Ibarra said the he takes 40-50 mg himself and a pill will usually last him about three hours.  Ibarra said he would usually buy 20 pills, sell them and then buy 20 more, but he always went for "scripts" (prescriptions).

27.  On February 19, 2019, a federal grand jury indicted Ibarra with one count of distributing a controlled substance which resulted in death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).

*Modus Operandi of Drug Traffickers*

28. I have experience, training, and communication with other law enforcement personnel who specialize in the area of illegal drug trafficking and the detection and documentation of proceeds from drug trafficking.  I also have experience in debriefing defendants and informants as witnesses who have personal knowledge of

drug trafficking organizations.  Such individuals often have personal knowledge regarding the methods, transportation, and distribution of the drugs and money in large scale controlled substance distribution operations.

29. I know, based on training and experience, as well as from information relayed to me during the course of my official duties:

    a.  That individuals involved in drug trafficking routinely utilize cellular telephones, tablets, and computers to make phone calls, send text messages, and communicate over other applications with other people in furtherance of their illegal goals.  During the course of these electronic communications, drug traffickers commonly use coded language and references and/or encryption in an effort to elude law enforcement detection.  Based on training and experience, I know that drug traffickers commonly use multiple, prepaid, or "throw away" cellular telephones to avoid detection and elude law enforcement, and they also change cellular phones frequently or use multiple cellular phones to avoid detection by law enforcement officials.

    b.  That drug dealers use cellular phones and other communication devices, in which they maintain names, addresses, and/or telephone numbers of their associates in the narcotics trafficking organization and customers of narcotics.

    c.  That drug traffickers store information pertaining to drug trafficking activities on electronic devices, including cell phones, tablets, computers, and removable storage media. I further know, based on my training and experience, as well as from information relayed to me during the course of my official duties, that drug traffickers often retain, for long periods of time, such electronic documents and devices, in order to maintain a record of contacts, accounts, income, expenditures, assets, and drug-related debts.

    d.  That drug traffickers routinely "rotate" electronic devices, including cell phones, in order to avoid detection by law enforcement. For example, a drug trafficker may possess multiple cell phones and alternate the use of the cell phones on a weekly or monthly basis, before rotating to another cell phone. Based on training and experience, I know that drug traffickers often retain possession of previously-used cell phones, even though such phones are no longer utilized in furtherance of drug trafficking.  Based on training and experience, I know that, while such phones may no longer be used for drug trafficking activities, the devices often contain electronic data, including call records, contact information, text messages, email, photos, video, and more, which can be evidence of past criminal activity.

    e.  That when drug traffickers amass large quantities of cash from the sale of drugs, the drug traffickers often attempt to legitimize these profits through the use of banks and financial institutions and their attendant services that include accounts, cashier's checks, money orders, wire transfers, and the like.  Based on training and experience, I know that evidence of such financial instruments, accounts, and other methods of "laundering" drug proceeds may be stored on digital devices, such as cell phones and computers.  I further know that narcotics traffickers often store electronic copies of records and receipts to such financial transactions on digital devices, such as cell phones.  My colleagues and I have seen, for instance, photographs of money orders, tracking numbers, and cash.

    f.  That drug traffickers take or cause to be taken photographs or videos of themselves, their associates, their property, and their product; and that these traffickers often maintain these

electronic images stored on digital devices such as cell phones, tablets, and computers.  One purpose for doing so appears to be to show and confirm they are in possession of the product they seek to distribute.

g. That drug traffickers maintain a variety of documents associated with their drug trafficking, including ledgers, hotel receipts, wire transfer paperwork, cell phone bills, photographs, credit card bills, vehicle registration documents, vehicle rental receipts, utility bills, and other documents that provide evidence of the illegal conduct of such individuals. I further know that drug traffickers often store digital versions of such documents in electronic devices such as cell phones.  My colleagues and I are also aware that more and more commonly such records exist only in electronic form as people more generally move from paper to electronic records to conduct the daily affairs of their life.

h. There are many reasons why drug traffickers maintain digital evidence for long periods of time. The evidence may be innocuous at first glance (*e.g.*, electronic versions of financial, credit card, and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, videos and photographs, utility records, ownership records, letters and notes, tax returns and financial records, telephone and pager bills, records relating to safe deposit boxes, and computer hardware and software), but have significance and relevance when considered in light of other evidence. The drug trafficker may no longer realize he still possesses the evidence on a digital device or may believe law enforcement could not obtain a search warrant to search the device and seize the evidence.  The drug trafficker may also be under the mistaken belief that he has deleted, hidden, or further destroyed any evidence stored on a digital device.  However, that evidence may still be retrievable by a trained forensic computer expert.

i. That drug traffickers are increasingly using computer hardware and software to communicate with co-conspirators and to facilitate the financial transactions associated with both the narcotics deals themselves and with the laundering of the related proceeds.  Computer hardware and software may contain communications between co-conspirators, spreadsheets of suppliers and buyers, financial records, bank account records, criminal contacts, and other information relevant to the investigation of the criminal enterprise.

j. Finally, I am aware that computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects:  (1) the objects themselves may be instrumentalities, fruits, or evidence of crime; and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Fed. R. Crim. P. 41 permits the government to search and seize computer hardware, software, documentation, passwords, and data security devices which are (1) instrumentalities, fruits, or evidence of crime; or (2) storage devices for information about crime.

*Information About Cellular Telephones and Computers*

30. Based on training and experience, your affiant knows that a cellular telephone (or mobile telephone, or wireless telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These

capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites.

31. Cellular telephones often have a subscriber identity module or subscriber identification module (SIM), which is an integrated circuit that securely stores the International Mobile Subscriber Identity (IMSI) and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number (ICCID), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage data, such as call history, text (SMS) messages, and phone book contacts.

32. Cellular telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet. They may also include GPS technology for determining the location of the device. Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data. Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations. Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications. Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

33. Based on training and experience, your affiant knows that digital storage devices, to include cellular phones, can store information for long periods of time. Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device. This information can sometimes be recovered with forensic tools.

34. Based on training and experience, your affiant knows that examining data stored on digital storage devices, to include cellular phones, can uncover, among other things, evidence that reveals or suggests who possessed or used the digital storage device.

35. Your affiant respectfully asserts there is probable cause to believe that things that were once stored on the digital devices in this case may still be stored there, for at least the following reasons:

   a. Based on training and experience, your affiant knows that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

   b. Deleted files or remnants of deleted files, therefore, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, hard drives of digital storage devices can contain electronic evidence relating to the manner of the devices' use and the identities of users of the device. This forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence; specialized software is typically required for that task. It is, however, technically possible for a user to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

36. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the digital devices that might serve as direct evidence of the crimes described in the warrant, but also forensic evidence on the digital devices that establishes how the digital devices were used, the purpose of the use, the identities of those who used the digital devices, and when the digital devices were used. There is probable cause to believe that this forensic electronic evidence might be on the digital devices because:

a.  Data on the devices can provide evidence of a file that was once on the storage device but has since been deleted or edited. Virtual memory paging systems can leave traces of information on the device that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the device that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created. This information can be recovered months after they have been downloaded onto the device, viewed, or deleted.

b.  Forensic evidence on a device can also indicate the identities of individuals who have used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how a digital storage device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, when the devices were used, and the identities of the individuals who used them.

d.  The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device constitutes evidence of a crime may depend on other information stored on the computer or digital storage device and the application of knowledge about how a computer or digital storage device behaves. Therefore, contextual information is necessary to understand other evidence which also falls within the scope of the warrant.

e.  Your affiant knows that when an individual uses an electronic device in furtherance of criminal activity, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium which contains evidence of the crime. The electronic device is an instrumentality of the crime because it is used to facilitate the commission of a criminal offense. Based on training and experience, I know that the electronic device is also likely to be a storage medium for evidence of crime. For example, an electronic device used in furtherance of drug trafficking may contain images of narcotics, proceeds of narcotics sales, and images and contact numbers of co-conspirators who are involved in narcotics distribution.

f.  Based on training and experience, your affiant understands that persons committing or planning to commit crime often use their cellular device in the area of criminal activity before, during, and after the alleged crime. Suspects may use the Internet or other electronic map applications to conduct map reconnaissance of locations associated with their criminal activity, in an effort to plan approach and escape routes.

g.  Based on training and experience, your affiant also knows that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine the true content of the file.

37. *Need to review evidence over time and to maintain the entirety of the evidence*. Your affiant recognizes the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad searches. For the following reasons, your affiant respectfully asserts that it would be impractical and infeasible for the government to review the mirrored images of digital devices, which are copied as a result of a search warrant issued pursuant to this Application, during a single analysis:

a.  Your affiant has learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this nature often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops. In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole. Forensic analysis is context-dependent, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in relation to other pieces of data.

b.  Your affiant has reviewed activity and data from digital devices in the course of ongoing criminal investigations. Your affiant has learned from that experience, as well as other investigative efforts, that multiple reviews are necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B. In order to obtain a full picture and complete meaning of the data from the information sought in Attachments A and B of this application, the government would need to maintain access to all of the resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation. As such, your affiant respectfully requests the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.

    c. As with all evidence, the government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

38. *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which your applicant is applying would permit seizing, imaging, copying, and reviewing the contents of the digital devices in Attachment A consistent with the terms of the warrant. The warrant for which your affiant is applying would authorize a later examination and perhaps repeated review of the data found on the digital devices or information from a copy of the digital devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, which might expose many parts of the digital devices to human inspection in order to determine whether it is evidence described by the warrant.

*Summary of Probable Cause*

39. I submit the evidence establishes Ibarra used devices capable of placing phone calls, sending text messages, and sending social media messages to communicate about controlled substances with customers and suppliers. Ibarra also used cell phones to take and/or store pictures of drugs and large amounts of cash.

40. Ibarra personally admitted to investigators he changed out his phone frequently and used as many as five different phone numbers. His statements are corroborated by the fact that he appears to have communicated with Ivan Warren using at least two, but more likely four, phone numbers. Evidence from Warren's phone showed Ibarra used 970-799-9214 and 970-689-1788, but those phone numbers appeared to have been labeled as "3" and "4" in the sequence of phone numbers Ibarra used to communicate with Warren. Ibarra used yet another number, 970-832-2469, to communicate with Ryan McMurray. Thus, it is a reasonable inference, based on Ibarra's own admissions and the evidence collected during this investigation, that the phones which were seized from Ibarra's home and vehicle were previously used to facilitate the distribution of controlled substances.

41. Although Ibarra claims to have had a practice of deleting text messages and Facebook messages, the review of his most recent phone shows he did not always delete all of the messages.

42. Tablets may be used to access email and social media, such as Facebook. Tablets are also capable of taking and storing photos.

43. Cell phones are capable of being backed up to home computers. Many users do this with photos in order to free up space on their phones or they do it with photos, contacts, or other content to ensure they do not lose such things if their phone breaks or they lose their phone. Thus, the two laptops which were seized are likely to have backup files related to the phones.

44. A forensic examination of computers can typically identify which external devices were attached to a particular computer. Depending upon the data on the computer and on the various devices, even the mere association of a phone to a particular computer could aid law enforcement in determining and later proving who the user of the phone or the computer was.

45. While some Facebook users have a Facebook application on their cell phones, Facebook can also be accessed from internet on a laptop computer. If the defendant accessed Facebook on the laptop computer, the computer may have cached some of the content which he viewed on Facebook. Thus, even if the

defendant deleted some evidence, it may still reside on his computer.

46. Some users have Facebook configured so that it sends the users emails with notifications.  If the defendant viewed his email on either of the laptop computers, those emails may be cached on the computers and might be accessible by law enforcement, even if the defendant deleted the messages from Facebook.

*Conclusion*

47. Based on the aforementioned factual information, I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of 21 U.S.C. § 841(a)(1) and (b)(1)(C) may be located within the electronic devices described in Attachment A.  These electronic devices have been stored in the custody of the FBI since the search warrant on January 31, 2019.

48. Although several months have passed, these devices have not been altered and would contain the same information as when originally collected, as electronic evidence tends to be preserved.  Furthermore, these devices were all recovered in close proximity to illegal drugs, or other items reasonably believed to be used in the distribution of illegal drugs.

49. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.


*s/Amy L. Howard*
Amy L. Howard, Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN by reliable electronic means on this ___22nd___ day of August, 2019.


HON. MICHAEL E. HEGARTY
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLORADO


Application for search warrant was reviewed and is submitted by Peter McNeilly, Assistant United States Attorney.